UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| NIIGATA MACHINE TECHNO CO., LTD, a Japanese Corporation, | ) ) ) | |
| Plaintiff, | ) ) | Case No. |
| vs. | ) ) ) | |
| SNK AMERICA, INC., an Illinois Corporation, | ) ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff, NIIGATA MACHINE TECHNO CO., LTD., by and through its undersigned attorneys, states and alleges as follows in support of its Complaint against Defendant, SNK AMERICA, INC.:

### The Parties

1. Niigata Machine Techno Co., Ltd. ("NMT") is a Japanese Corporation with its principal place of business in Japan, which manufactures machine tools.

2. SNK America, Inc. ("SNK") is an Illinois Corporation with its principal place of business in the State of Illinois. SNK transacts business in the Western Division of the Northern District of Illinois.

### Jurisdiction

3. Jurisdiction is proper under 42 USC § 1332 based on diversity of citizenship between the parties, and the amount in controversy exceeds $75,000.00 exclusive of interest and costs. Federal jurisdiction is also afforded under the Copyright Act, 17 U.S.C. 101, et seq., and section 43(a) of the Lanham Act, 15 U.S.C. § 1125.

1

## Venue

4.     Venue is proper in the Western Division because SNK transacts business and sells machine tools in the Western Division of the Northern District of Illinois.

## Factual Allegations Common to All Counts

5.     On or about April 4, 2003, NMT and SNK entered into a written Dealership Agreement ("the 2003 Dealership Agreement"). The 2003 Dealership Agreement is written in the Japanese language, and provides that SNK would serve as NMT's exclusive North American distributor of NMT's machine tools throughout its term. A true and correct copy of the April 4, 2003 Dealership Agreement in the Japanese language is attached hereto and incorporated herein as Exhibit A1; and a true and correct copy of what is believed to be an accurate English translation of the 2003 Dealership Agreement is attached hereto and incorporated herein at Exhibit A2. The 2003 Dealership Agreement's duration was one year in length (April 4, 2003 - April 4, 2004). However, it provided that it would be renewed annually for subsequent one-year terms, unless either party provided notice of its termination no later than three months ahead of its next expiration/renewal date.

6.     The 2003 Dealership Agreement took effect and both parties performed under it for over a decade. The 2003 Dealership Agreement includes a "best efforts" clause in paragraph 3 thereof, requiring SNK to use its best efforts to meet sales targets.

7.     Both SNK and NMT were owned by a private holding company in Japan up until approximately January 21, 2016, at which time NMT was sold to a separate legal entity. Because of this change in ownership of NMT, SNK and NMT were no longer owned by a single holding company after the January 21, 2016 sale of NMT.

2

8. No longer under common ownership, NMT and SNK signed a document in or about early February 2016, indicating that the parties were interested in potentially extending the 2003 Dealership Agreement for a period of 5 years, "subject to" being able to work out the terms of a "revised dealership agreement." A true and correct copy of this document memorializing the parties' intention to attempt to negotiate a "revised dealership agreement" is attached hereto as Exhibit B.

9. NMT and SNK thereafter held discussions in February and March 2016 to attempt to negotiate the terms of a revised, written dealership agreement, the execution of which was a condition precedent to any agreement for a five-year extension of 2003 Dealership Agreement.

10. On or about March 16, 2016, NMT and SNK signed a one-page document that set forth a number of points that they had discussed on or about March 15, 2016 regarding potential terms and conditions of a revised dealership agreement. This one-page document listed a number of terms and conditions, including material terms and conditions "to be described", that would need to be agreed to, in order to reach a legally binding, revised dealership agreement, but that had not been agreed to. A true and correct copy of this one-page document signed by NMT and SNK on or about March 16, 2016 is attached hereto as Exhibit C.

11. This one-page document (Exhibit C) did not constitute a "revised dealership agreement" or a legally-binding, written extension of the 2003 Dealership Agreement. Various material terms and conditions had not been agreed to, as reflected in that document.

12. For example, without limitation, that document by its own terms states that any extension of the original Dealership Agreement would be subject to "some condition to be described in the revised contract when top management, solvency, ownership, litigation, etc. shall be occurred." (Ex. C, at line 14, column 3).

3

13. As another example, the parties had not reached an agreement as to the appropriate target number of orders to be set forth in any contract extension (Exhibit C, at line 15, column 3), and the parties had not reached an agreement as to whether SNK would be the sole promoter of NMT products in North America or whether NMT and SNK would mutually communicate with customers and potential customers (Exhibit C, at line 16, column 3). As to this latter point, NMT was concerned in March 2016 that SNK might not aggressively promote its products, since SNK and NMT were no longer commonly-owned by the same holding company, and were now competitors with respect to certain product lines.

14. Despite the parties' efforts in 2016 to reach an agreement regarding a "revised dealership agreement" and/or enter into a legally-binding extension of the 2003 Dealership Agreement, the parties were not able to resolve their material differences.

15. In or about mid-2016, SNK unilaterally, and without the agreement of NMT, discontinued the parties' long-standing custom and practice of stocking substantial product inventory in the North American market. Because other competitors in the North American market stocked substantial product inventory in that market, NMT was seriously disadvantaged by SNK's unilateral decision to not stock inventory, since the vast majority of sales of product took place from inventory because of customers' requirements for short delivery time. Without substantial product stocked in inventory, a special order would typically take 6-10 months or longer to manufacturer and ship to the customer, and SNK was aware of this when it unilaterally discontinued stocking NMT product in inventory.

16. SNK's unilateral decision to discontinue the parties' long-standing custom and practice of stocking substantial product in inventory caused a dramatic reduction in NMT's sales, as NMT feared it would do. For example, in calendar year 2015, when SNK was fully incentivized to aggressively promote NMT's products in good faith because SNK and NMT were both owned

4

by the same holding company, SNK received approximately $20 million in horizontal machining centers and CNC boring mills it ordered from NMT, to sell in the North American market. By stark contrast, in calendar year 2016, the year in which NMT was sold by the holding company, and the year in which SNK unilaterally stopped stocking NMT products in inventory, and stopped using its best efforts to market NMT products, SNK received only about $3 million in horizontal machining centers and CNC boring mills it ordered from NMT, to sell in the North American market, which is an 85% reduction in sales from one calendar year to the next.

17. Despite attempts throughout 2016, NMT and SNK were unable to reach an agreement for a revised dealership agreement or to extend the 2003 Dealership Agreement. As a result, on or about December 23, 2016, NMT sent a written termination notice to SNK, advising that the April 4, 2003 Dealership Agreement would expire on April 4, 2017, and that it would not be renewed. A true and correct copy of said written termination notice is attached hereto and incorporated herein as Exhibit D.

18. On April 4, 2017, the April 4, 2003 Dealership Agreement expired and was no longer in force. The next day, April 5, 2017, SNK signed a non-binding Memorandum of Understanding with NMT's wholly-owned subsidiary and agent, Niigata Machine Techno USA, Inc. (NMT-USA). A true and correct copy of said Memorandum of Understanding ("the April 5, 2017 MOU") is attached hereto and incorporated herein as Exhibit E.

19. The April 5, 2017 MOU provided that SNK would temporarily act as NMT's exclusive distributor in North America (excluding Mexico), for its horizontal boring machines manufactured by Niigata Machine Techno Co., Ltd. for a period of 90 days (from April 5, 2017- July 4, 2017). (Ex. E).

20.     The April 5, 2017 MOU also confirmed that during that 90-day period, the parties would "negotiate to see whether they can reach an agreement on an exclusive, two-year distributor agreement." (Ex. E).

21.     NMT and SNK continued discussions on and after April 5, 2017 for several months, to attempt to negotiate the terms of a two-year exclusive distributor agreement, but were unable to reach an agreement in that regard.

22.     Accordingly, on or about June 30, 2017, NMT through its agent and wholly-owned subsidiary NMT-USA sent a written notice to SNK, advising that the temporary, 90-day arrangement (evidenced by the April 5, 2017 MOU, Exhibit E hereto) would expire on July 4, 2017. A true and correct copy of the June 30, 2017 notice to SNK is attached hereto and incorporated herein as Exhibit F.

23.     Based on the foregoing, as of July 5, 2017, NMT had no further contractual obligations to SNK, and SNK had no right to advertise, market, promote or sell NMT products, whether on an exclusive basis or otherwise.

24.     Contrary to the fact that the April 4, 2003 Dealership Agreement was terminated effective April 4, 2017, and contrary to the fact that the April 5, 2017 MOU expired on July 4, 2017, SNK has continued to hold itself out to the public as NMT's exclusive distributor of its products in North America, has continued to use NMT's trademarked and stylized "Niigata" name and copyrighted materials on its website as alleged in detail below, and has continued to attempt to place orders with NMT and with NMT-USA, as though the April 4, 2003 Dealership Agreement and/or the April 5, 2017 MOU is still in effect.

25.     SNK's conduct in wrongfully disregarding the notice terminating the April 4, 2003 Dealership Agreement, and disregarding the expiration of the April 5, 2017 MOU, and its conduct

in thereafter holding itself out to the public as NMT's exclusive North American distributor, has caused market confusion and damage to NMT's business and reputation, which harm is ongoing.

26. Prior to termination of the Dealership Agreement that was effective as of April 4, 2017, NMT accepted an order from SNK for a machine, and shipped that product according to SNK's directions and invoiced SNK for that product on or about November 20, 2016. More than 180 days have passed since NMT shipped and invoiced SNK for that product, and SNK has failed to remit payment due in the amount due in excess of 40 million Yen, which is equal to more than $300,000 USD. SNK is therefore in arrears and in material breach of the 2003 Dealership Agreement based on this order that SNK placed and NMT fulfilled prior to the termination of the Dealership Agreement.

27. Accordingly, SNK is indebted to NMT on this overdue account in an amount of no less than 40 million Yen, or no less than $300,000 USD, as of May 20, 2017. Attached hereto and incorporated herein as Exhibit G is a true and correct copy of a past due account statement reflecting this past due receivable owed to NMT by SNK.

## COUNT I

### Breach of Contract

28. NMT restates the forgoing allegations as if fully restated herein.

29. SNK's conduct alleged above constitutes a material breach of the Dealership Agreement, including its best efforts clause and payment terms.

30. NMT has suffered direct, incidental and consequential damages in excess of $5 million which are ongoing, as a direct and proximate result of SNK's numerous, material breaches of contract, through: a) NMT's loss of substantial sales of product in 2016 and 2017 (through the April 4, 2017 effective date of termination) as a result of SNK's failure to use its best efforts to promote NMT products; b) through SNK's failure to remit payment for products sold and delivered

as alleged herein; and c) through SNK's failure to honor its warranty obligations that continue after termination of the Dealership Agreement, and through other material breaches of the Dealership Agreement by SNK.

31. NMT has substantially performed all of its contractual obligations at all times relevant.

WHEREFORE, Plaintiff respectfully prays that the Court enter judgment in its favor and against Defendant SNK in an amount in excess of $5 million, plus costs of suit and any other and further relief this court deems just.

## COUNT II

### Declaratory Judgment as to Termination of 2003 Dealership Agreement

32. NMT restates the forgoing allegations as if fully restated herein.

33. Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201, the Court is authorized to issue a declaratory ruling as to a genuine case or controversy.

34. As alleged in detail below, NMT and SNK have a current legal dispute as to whether the 2003 Dealership Agreement has been terminated (as NMT contends) or has been extended by written agreement (as SNK contends).

35. More particularly, SNK has recently asserted and continues to assert that on February 2, 2016, the parties signed a legally-binding written extension of the 2003 Dealership Agreement for a period of five years.

36. NMT asserts that the 2003 Dealership Agreement was terminated and was not extended or renewed, or in the alternative, that SNK is barred from enforcing the 2003 Dealership Agreement based on its own prior, material breach thereof.

37.  There is a genuine case or controversy between the parties as to whether the 2003 Dealership Agreement was terminated and not renewed or extended, and/or whether SNK is barred from enforcing the 2003 Dealership Agreement based on its prior, material breach thereof.

WHEREFORE, Plaintiff NMT respectfully prays that the Court enter a declaratory judgment in its favor and against SNK, declaring and adjudicating: (1) that the 2003 Dealership Agreement was terminated effective April 4, 2017 and was not renewed or extended; (2) that other than SNK's post-termination duties thereunder, the 2003 Dealership Agreement is no longer in effect; or in the alternative, (3) that SNK is barred from enforcing the Dealership Agreement based on its own prior, material breach thereof; (4) that SNK has no further right to advertise, market, promote, distribute or sell NMT products or use NMT's trademarked name or copyrighted materials in its advertising and promotion; and (5) for any other and further relief the Court deems just.

## COUNT III

### Breach of Implied Duty of Good Faith

38.  NMT restates the forgoing allegations as if fully restated herein.

39.  Under Illinois law, there is a duty to act in good faith implied in every contract.

40.  As alleged above, after NMT was sold in January 2016 and no longer under common ownership with SNK through a single holding company, SNK and NMT were competitors with respect to certain product lines. However, SNK continued to serve as NMT's exclusive product distributor in the North American market, until the Dealership Agreement was terminated effective April 4, 2017.

41.  During this time period from January 2016 through the contract termination effective April 4, 2017, SNK breached its duty of good faith, by actively taking steps to diminish

NMT's product sales and competitive position in the market, as alleged herein, including without limitation in the following ways:

(a) SNK unilaterally changed the parties' long-standing custom and practice of stocking substantial product inventory, in order to remain competitive with other companies that similarly stocked product inventory, thereby making NMT substantially less competitive, because of the long lead-time that would result since the products would no longer be readily available for shipment from North American inventory;

(b) SNK unilaterally changed the parties' long-standing custom and practice of maintaining an equal number of NMT and SNK machines in SNK's showroom floor in Illinois, to allow customers and prospective customers to view and evaluate the actual products, rather than mere brochures or online photographs of the products. Beginning in or about September 2016, SNK changed this long-standing practice, and displayed only one NMT machine on its showroom floor, which was a 3-year old used machine, next to several new SNK machines. This action by SNK made NMT substantially less competitive with respect to SNK's competing machines. This unilateral action also made NMT substantially less competitive with other companies, because the other competitors in this product line have expansive product displays in numerous showrooms in North America, and because customers typically require a pre-purchase evaluation of the actual product before making a purchase decision, because of the substantial capital expenditure required to purchase the products at issue;

(c) In mid-late 2016, three manufacturing companies in the New England area were negotiating with SNK regarding the purchase of approximately $3 million of NMT products for use in the aerospace industry. These three manufacturers had been long-time customers of NMT products, having purchased NMT products for more than 15 years for their use in manufacturing components for the aerospace industry. At the time SNK was working with these three manufacturers in mid-late 2016, SNK was still serving as NMT's exclusive North American distributor under the 2003 Dealership Agreement that had not yet been terminated. Rather than acting in good faith to consummate the sale of the approximately $3 million of NMT product to these manufacturers, SNK wrongfully diverted this substantial sale to its own product line that was competitive with this NMT product line;

(d) In or about September 2016, during the International Machine Tool Show (IMTS) at the McCormick Place Convention Center in Chicago, Illinois that is considered the premier semi-annual marketing event in this industry, SNK advised NMT that, despite SNK's previous, long-standing custom and practice of participating in this trade show with a large and prominent booth that featured two or more NMT machines, SNK would no longer display NMT products at this semi-annual trade show that is considered an essential part of any international machine tool

10

        manufacturer's marketing plan. Instead, SNK advised NMT that it would participate in this trade show going forward in association with one of its related companies, to the exclusion of NMT; and

(e)     NMT relied on SNK to act in good faith under the Dealership Agreement, because SNK had the exclusive right under the Agreement to sell NMT products in North America, and therefore NMT could not sell these products through other outlets at that time. Contrary to its duty to act in good faith, during the approximately 15-month time period between the sale of NMT in January 2016, and the termination of the 2003 Dealership Agreement effective April 4, 2017, SNK actively took steps to impair NMT's reputation in the industry and to divert NMT's business to itself as alleged herein.

(f)     In a meeting on or about July 31, 2017, despite SNK's post contract-termination obligations to perform warranty work under the 2003 Dealership Agreement on previously sold NMT product, SNK's national sales manager Tom Klukow advised NMT that it would only perform warranty work for customers who had historically purchased products from both SNK and NMT, since SNK wanted to take care of those customers; but that it would not perform warranty work for customers who had only purchased NMT products. This conduct on the part of SNK evidences SNK's intention to maliciously and intentionally injure NMT's reputation in the market, by leaving NMT's customers without readily available warranty service, since SNK is also asserting that it is the authorized service center for NMT products under the purported 5-year contract extension that SNK asserts was reached in February 2016 as set forth above. This position by SNK is wrongful and predatory, since SNK is thus simultaneously asserting that it holds the <u>exclusive</u> right to provide service for NMT products during the its alleged 5-year contract extension, while at the same asserting that it will no longer perform service on NMT products if the customer is not also a purchaser of SNK products;

(g)     SNK engaged in other, similar bad faith conduct designed to injure and impair NMT's reputation and position in the market.

42.     As a direct and proximate result of SNK's breach of its implied covenant of good faith under the 2003 Dealership Agreement, NMT suffered a substantial and persistent decline in product sales in 2016 and early 2017, up to and through the date that the 2003 Dealership Agreement termination became effective on April 4, 2017.

43.     As a direct and proximate result of SNK's breach of its implied duty to act in good faith under the 2003 Dealership Agreement, NMT has suffered substantial damages in an amount in excess of $5 million, to be determined at trial.

WHEREFORE, Plaintiff NMT respectfully prays that the Court enter judgment in its favor and against Defendant SNK, in an amount in excess of $5 million, plus costs of suit and any other and further relief this court deems just.

## COUNT IV

### Lanham Act Section 43 Violation

44.     NMT restates the forgoing allegations as if fully restated herein.

45.     NMT registered its trade name "Niigata" with the stylized logo, including the downward and upward slanted, staggered double letter "i", as a trademark in Japan, in or about 1994. In addition, NMT has affixed its trade name "Niigata" with the stylized logo onto its product line for more than 20 years, and has placed those products into the stream of commerce in North America and elsewhere over that time period. The relevant consumers in the market have come to recognize Niigata products and product quality by the recognizable name and stylized logo. Accordingly, NMT has both registered trademark rights and common law trademark rights with respect to the "Niigata" name and stylized logo.

46.     In direct contravention of NMT's trademark rights, SNK has continued to advertise and display NMT's trademarked name "Niigata" with the stylized logo on SNK's website http://www.snkamerica.com/ and, on information and belief, in other forms of advertising utilized by SNK, after the April 4, 2017 termination date of the 203 Dealership Agreement, and after the expiration of the 90-day period under the MOU on July 4, 2017. For example, without limitation, on August 3, 2017, SNK's website http://www.snkamerica.com/ continued to display NMT's trademark, "Niigata" with the stylized logo. Attached hereto and incorporated herein as Exhibit H is a true and correct copy of a screenshot of SNK's website as of August 3, 2017.

12

47. The Federal Lanham Act, commonly known as the "Trademark Act", provides in section 43(a) as follows:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
>> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>>
>> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125.

48. Damages under the Lanham Act may include: (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action, as well as reasonable attorney fees to the prevailing party in exceptional cases. 15 U.S.C. § 1117.

49. SNK's unlawful and unauthorized use of NMT's trademark, after the termination of the 2003 Dealership Agreement, is causing confusion in the market for the products at issue, or is likely to cause confusion in the market, because customers or prospective customers are likely to mistakenly believe that SNK is still an authorized dealer, or even the <u>exclusive</u> authorized dealer, of NMT's products, and are thereby likely to contact SNK rather than NMT or its wholly-owned subsidiary, NMT-USA, for Niigata products.

50. Furthermore, since SNK and NMT are no longer under common ownership of a single holding company, and since SNK has been a competitor with NMT since January 2016 with respect to certain products, SNK has taken steps as alleged above to diminish NMT's

competitiveness and to reduce its sales. Accordingly, on information and belief, customers who contact SNK believing that SNK represents the NMT product line will be steered toward SNK products and away from NMT products, causing NMT to suffer damages in the form of lost profits, and other incidental and consequential damages, while SNK wrongfully profits from its use of Niigata's trademarked name.

WHEREFORE, Plaintiff respectfully prays that the Court enter judgment in its favor and against Defendant in an amount in excess of $5 million, plus costs of suit and any other and further relief this court deems just.

## COUNT V
### SNK's Violation of NMT's Copyrights

51. NMT restates the forgoing allegations as if fully restated herein.

52. NMT created various original photos, videos and narrative content pertaining to its products that contain a modicum of creativity, and that therefore constitute copyrighted works pursuant to the U.S. Copyright Act.

53. Without authorization or license, and in direct contravention of NMT's exclusive copyrights in the subject works, including its exclusive right to publicly display or advertise its copyrighted works pursuant to 17 U.S.C. § 106(5), SNK continues to display and advertise NMT's copyrighted works on SNK's website http://www.snkamerica.com/ and, on information and belief, in other forms of advertising utilized by SNK after the April 4, 2017 effective date of termination of the 2003 Dealership Agreement, and after the expiration of the 90-day period under the MOU on July 4, 2017.

54. For example, without limitation, on August 3, 2017, SNK's website http://www.snkamerica.com/ continued to display NMT's copyrighted videos of Niigata HN50E-5X/63E-5X and HN63E-5X machines, which videos were created by NMT in Japan.

55. As a further example, on August 3, 2017, SNK's website http://www.snkamerica.com/ continued to display NMT's product brochures, which were created by NMT in Japan. (*See* copies of NMT brochures advertised on SNK's website, attached as Group Exhibit I hereto).

56. SNK's conduct has caused substantial damages to NMT, and has caused customer confusion by misleading customers and potential customers of NMT's products into believing that SNK is still a distributor or the sole distributor of NMT's products.

WHEREFORE, Plaintiff respectfully prays for a judgment: (1) directing SNK to remove all unauthorized copies of NMT's copyrighted works from its website and all other forums; (2) awarding NMT its actual damages and attorney's fees under the Copyright Act; and (3) any further relief deemed just, including a court order requiring SNK to post a corrective notice on its website as the court deems appropriate.

**PLAINTIFF HEREBY DEMANDS TRIAL BY JURY AS TO ALL COUNTS SO TRIABLE**

Respectfully Submitted,

NIIGATA MACHINE TECHNO CO., LTD.,

BY: WILLIAMS McCARTHY, LLP

BY: /s/ Marc C. Gravino
Marc C. Gravino

Prepared by:
Marc C. Gravino
John J. Holevas
Joel Huotari
WilliamsMcCarthy, LLP
120 W. State Street, 4th Floor
P.O. Box 219
Rockford, IL 61105-0219